IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DARREN MCCRACKEN, | ) |
| | ) |
| Petitioner, | )      4:02cv3090 |
| | ) |
| vs. | )      MEMORANDUM AND ORDER |
| | ) |
| HAROLD W. CLARKE, | ) |
| | ) |
| Respondent. | ) |

This matter is before the court on the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("§ 2254 petition") filed by the petitioner, Darren McCracken. Also before the court are the respondent's Answer to the § 2254 petition, and the parties' briefs regarding the petitioner's § 2254 claims and the respondent's defenses.

## I. BACKGROUND

The facts and history of the petitioner's case are set out in State v. McCracken, 615 N.W.2d 902 (Neb. 2000), and are not in dispute. On July 1, 1993, the petitioner shot his mother, Vicky Bray, twice in the head. See McCracken, 615 N.W.2d at 910. Bray died as a result of these gunshot wounds two weeks later. See id. Since the petitioner was 13 years old at the time of the shooting, "[a] petition was filed in the county court for Gosper County, sitting as a juvenile court, alleging that McCracken had committed acts bringing him within Neb. Rev. Stat. § 43-247(2) (Reissue 1993)." Id. The petitioner sought to admit the allegations set forth in the petition, but the juvenile court refused to accept the admission and instead ordered the petitioner to undergo a "pre-adjudication evaluation." Id. According to the transcript of the juvenile court proceedings, the State requested the evaluation "to determine whether the juvenile [is] competent to participate in these proceedings, whether he is responsible for his acts, and whether or not there is a necessary emergency psychological treatment necessary [sic] for Mr. McCracken." (See JBOE at 9:4-8.)[1] The evaluation was completed, and it appears in the Bill of Exceptions in the District Court as Exhibit 2. (See BOE, Ex. 2, evaluation of Charles J. Mora, M.D., dated July 21, 1993 (hereinafter "Exhibit 2")). The evaluation includes a recommendation that the petitioner undergo a "forensic psychiatric examination," (see Ex. 2 at 7), and the State and the petitioner joined in a request that such an examination be conducted, (see

---

[1] I will refer to the one-volume Bill of Exceptions in the juvenile proceedings for Case No. JV93-15 as "JBOE," and to the three-volume Bill of Exceptions in the District Court as "BOE."

1

JBOE at 20:4-21:23). Indeed, the petitioner requested that the scope of the examination be expanded to "address the issue of not responsible by reason of insanity." (Id. at 21:11-23.) The juvenile court granted the request for an examination, (see id. at 22:5-17), and the examination report appears in the Bill of Exceptions in the District Court as Exhibit 3, (see BOE, Ex. 3, evaluation of Rafael Tatay, M.D., and Martin A. Sweeney, Psychiatric Social Worker, dated October 14, 1993 (hereinafter "Exhibit 3")).

On November 3, 1993, the juvenile court petition was dismissed, and the petitioner was charged in the district court for Gosper County with first degree murder. See McCracken, 615 N.W.2d at 910. The petitioner moved to transfer the case back to juvenile court. See id. During the hearing on the petitioner's motion to transfer, the State introduced, without objection, Exhibits 2 and 3. See id. The district court ultimately denied the motion to transfer and retained jurisdiction over the case. See id.

Prior to the trial, the petitioner gave formal notice of his intention to present an insanity defense. See McCracken, 615 N.W.2d at 910-11. In opposition to this defense, the State called Sweeney and Tatay, the authors of Exhibit 3, to testify at trial. See id. at 911. "Sweeney testified that there was no way to ascertain from his evaluation whether McCracken knew the difference between right and wrong on July 1, 1993," but added that during his and Tatay's evaluation, there was no time that the petitioner "couldn't make the distinction between right and wrong." Id. Tatay testified too that the purpose of his and Sweeney's evaluation was to determine whether the petitioner was competent to stand trial, and that the evaluation "was not conducted to assess whether McCracken knew right from wrong at the time he shot Bray." Id.[2] However, based upon extensive examinations and a review of the petitioner's medical history and school records, Tatay offered an opinion that the petitioner knew right from wrong at the time of the shooting. See id. In addition to the testimony of Sweeney and Tatay, the State offered Exhibits 2 and 3 into evidence at trial. See id. Exhibit 3 was received without objection, (see BOE, Vol. III, at

---

[2]Sweeney's and Tatay's testimony suggests that despite the court's order that the examination address the "insanity" issue as requested by the petitioner's counsel, this did not occur. It should be noted, however, that the court's order was not particularly clear on this point. (See JBOE at 22:7-15 ("I will grant that motion and order that Darren McCracken be evaluated at the Lincoln Regional Center . . . for further evaluation to determine Mr. McCracken's competency to stand trial included in the context that [the petitioner's counsel] referred to and also to address the issue of the recommended treatment that Mr. McCracken would be amenable to and to order the Lincoln Regional Center to make their report and submit it to the Court as quickly as possible.") (emphasis added).) It should be noted too that Exhibit 3 states that the petitioner was evaluated "to determine his competency to stand trial pursuant to the McNaughton [sic] rule," which also suggests confusion concerning the scope of the evaluation. (Ex. 3 at 1. See also BOE, Vol. III, at 500:20-502:11.)

467:24-468:2), but Exhibit 2 was not received, (see id. at 483:19-22, 484:23-485:16, 494:4-10).

James Cole, Ph.D., was called to testify on behalf of the defense. See McCracken, 615 N.W.2d at 911. Cole testified that the petitioner suffered from a condition "similar to posttraumatic stress syndrome in that McCracken would escape into a fantasy world when faced with stressful situations." Id. Cole added, however, that the petitioner's condition was "much worse than posttraumatic stress syndrome because of underlying weakness in McCracken's personality." Id. Cole also testified that "McCracken's mental status had a high likelihood of deteriorating into a full-blown psychosis, due in part to the fact that McCracken was the victim of physical, sexual, and emotional abuse." Id. "Cole believed that McCracken was competent to stand trial and further explained that in retrospect, McCracken knew that it was wrong to shoot Bray but that in McCracken's mind, he 'thought it was the right thing to do' because of the misery Bray would suffer if he ran away from home." Id.

At the close of the evidence, "McCracken requested jury instructions on the lesser-included offenses of second degree murder, manslaughter, and assault in the first and second degrees." McCracken, 615 N.W.2d at 911. These requests were denied. See id. at 912.

On May 26, 1994, the jury found the petitioner guilty of first degree murder, and he was sentenced to life imprisonment. See McCracken, 615 N.W.2d at 912. The petitioner's appeal and pro se motion for postconviction relief were unsuccessful.[3] See generally id. He then filed the instant motion for relief under 28 U.S.C. § 2254, arguing that: 1) the district court improperly weighed the relevant statutory factors when it decided not to transfer the petitioner's case back to juvenile court; 2) the use of the pretrial psychiatric evaluations at the district court transfer hearing violated his Fifth Amendment privilege against self-incrimination and deprived him of due process; 3) the use of Exhibit 3 at trial, along with other disclosures from the pretrial psychiatric examination, deprived him of due process and a fair trial, and again violated his Fifth Amendment privilege against self-incrimination; 4) the trial count's failure to instruct the jury on the lesser-included offenses deprived the petitioner of due process and a fair trial; and 5) trial counsel's failure to object to the admission of the pretrial psychiatric evaluations at the transfer hearing, failure to argue effectively in favor of the lesser-included offense instructions, and failure to file a plea in bar to preserve the issue of double jeopardy violated the petitioner's Sixth

---

[3]Procedural irregularities arose in the plaintiff's appeal, see McCracken, 615 N.W.2d at 912, but these irregularities are not relevant in the instant case.

Amendment right to the effective assistance of counsel.[4] Each of these arguments will be addressed in turn below.

## II. STANDARD OF REVIEW

Consideration of the petitioner's § 2254 claims is circumscribed by 28 U.S.C. § 2254(d) and (e), which limit this court's review of habeas corpus claims adjudicated on the merits in the state courts. Under 28 U.S.C. § 2254(d), I may grant the petition only if the Nebraska courts unreasonably or incorrectly applied United States Supreme Court precedent or unreasonably determined the facts in light of the record. 28 U.S.C. § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In addition, this court may not review a state court's interpretation of its own law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding

---

[4]The petitioner has also alleged that trial counsel was ineffective for failing to argue that the petitioner's confession was obtained in violation of the Fifth Amendment. (See filing 29 at 26-27.) However, this argument was not raised in the petition or in the state courts, and is barred.

4

whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also Taylor v. Bowersox, 329 F.3d 963 (8th Cir. 2003), cert. denied, 124 S. Ct. 1681 (2004). "A state's interpretation of its own law is virtually unreviewable by a federal court." Id., 329 F.3d at 968. Accord Davidson v. Bowersox, 288 F.3d 1076 (8th Cir.), cert. denied, 537 U.S. 925 (2002). "It is not within the prerogative of a federal habeas court to question a state court's interpretation of its state's law . . . ." Id., 288 F.3d at 1078.

### III. ANALYSIS

#### A. Whether the District Court Properly Weighed the Statutory Factors When It Determined Not to Transfer the Case to Juvenile Court

Nebraska Revised Statute § 29-1816 provides that a juvenile may file a motion requesting the district court to waive jurisdiction to the juvenile court. Nebraska Revised Statute § 43-261 requires the district court to consider the factors that are to be assessed by a county attorney under Nebraska Revised Statute § 43-276. In 1993, the district court would have been required to consider the following factors: (1) treatment to which the juvenile would be amenable; (2) nature of the charged offense; (3) motivation for the offense; (4) age of the juvenile and any relevant others; (5) history of the juvenile, including previous offenses, antisocial behavior or physical violence; (6) sophistication and maturity of the juvenile; (7) facilities available for treatment and rehabilitation of the juvenile; (8) best interests of the juvenile and the security of the public, and (9) other.

The district court addressed these factors and found in favor of retaining jurisdiction. The Nebraska Supreme Court summarized the district court's findings as follows:

The first, fourth and fifth factors weighed in favor of transferring the case back to juvenile court: "(1) [T]he type of treatment that McCracken would be most amenable to is at a youth facility, which favored transferring jurisdiction to the juvenile court; . . . (4) McCracken's age of 13 years favored transferring jurisdiction; [and] (5) McCracken had no prior criminal history, which also favored transferring the case to juvenile court . . . ." McCracken, 615 N.W.2d at 915-16.

The third, sixth and seventh criteria were neutral: " (3) [T]he evidence of motivation for the crime (McCracken did not wish to have Bray cry when he ran away from home again) weighed neither in favor of nor against retaining jurisdiction; . . . (6) McCracken's sophistication and maturity was unclear in light of the evidence presented at the hearing, and no determination could be made either in favor of or against retaining jurisdiction; [and] (7) the type of treatment McCracken needed could not be better obtained in either system,

5

and this criteria weighed in favor of neither transferring nor retaining jurisdiction . . . ." Id. at 916.

The second and eighth factors weighed in favor of retaining jurisdiction to try the petitioner as an adult in the district court: "(2) [T]he crime involved extreme violence, which favored retaining jurisdiction; . . . [and] (8) 'without question' the best interests of the juvenile and the security of the public require that the district court retain jurisdiction, especially since the crime was so violent and McCracken's psychiatric prognosis was so poor." Id. at 915-16.

After weighing these factors, "The district court . . . concluded that 'it is not appropriate that Mr. McCracken be treated as a juvenile, because of the extreme risk of danger that he presents to himself and society,' and McCracken's motion to transfer was denied." Id. at 916.

The petitioner argues that the district court failed to properly assess these factors, and that the district court's decision not to transfer the case to juvenile court was erroneous. Specifically, he argues that the three factors judged by the district court to be neutral should have favored transfer. (See filing 29 at 11-14.) First, he submits that the third factor, which concerns the motivation for the offense, should have favored transfer because "his stated motivation for the crime," which "was to prevent his mother from experiencing misery and suffering when he ran away from home," "does not lend itself to the thinking of a normal functioning adult." (Filing 29 at 12.) On the contrary, he argues that his rationale was "very immature, and tends to lend credence to the fact that McCracken should NOT have had his case tried in adult courts." (Id. at 12-13 (emphasis in original).) The petitioner argues that this same evidence, along with the evidence provided by the mental health professionals, should have supported a finding under the sixth factor that the petitioner's lack of sophistication and maturity favored a transfer of the case to juvenile court. (See id. at 13-14.) Finally, the petitioner argues that factor seven should have favored transfer because the facilities available in the juvenile system "would have been better equipped to address McCracken's treatment and rehabilitation needs." (Id. at 14.)

As I noted previously, I am limited to determining whether the district court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254. Quite simply, I am not persuaded that the district court's assessment of the facts was unreasonable or that the decision to deny the transfer to juvenile court was contrary to, or involved an unreasonable application of, clearly established federal law. Indeed, even if the three "neutral factors" favored transfer, it does not follow that the district court would have been required to transfer the case. The

6

Nebraska Supreme Court has held that "in weighing [the] factors, there is no arithmetical computation or formula required in the court's consideration of the statutory criteria. McCracken, 615 N.W.2d at 915 (quoting State v. Mantich, 249 Neb. 311, 318, 543 N.W.2d 181, 188 (1996)).

> Moreover, "[i]n order to retain the proceedings, the court does not need to resolve every factor against the juvenile." "There are no weighted factors and no prescribed method by which more or less weight is assigned to each specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile."

Id. (quoting Mantich, 249 Neb. at 318, 543 N.W.2d at 188) (citations omitted). Here, the "violent and aggressive nature" of the offense and the threat posed by the petitioner to the public supported the district court's decision to retain jurisdiction over the case. See id. at 916. The district court's decision to assign great weight to these factors, after considering all of the relevant criteria, was not unreasonable nor contrary to federal law. I must therefore reject the petitioner's argument that he is entitled to habeas corpus relief because the district court did not properly consider the criteria set forth in Nebraska Revised Statute § 43-276.

### B. Whether the Use of the Mental Health Evaluations at the Transfer Hearing Violated the Petitioner's Rights

The petitioner argues next that the district court's consideration of Exhibits 2 and 3 in the transfer hearing violated the privilege against self incrimination protected under the Fifth Amendment. (See filing 29 at 17-21.) I note that the petitioner's arguments that the district court improperly weighed the factors set forth in § 43-276, which is discussed in the previous section, is based upon the evidence set forth in these exhibits. (See, e.g., filing 29 at 4 ("The district court erred in refusing to transfer Mr. McCracken's criminal case back to the juvenile courts when . . . the psychological evaluations showed him to have impaired mental ability and lack of maturity.").) Therefore, to the extent that the petitioner maintains that the favorable statements contained in Exhibits 2 and 3 must be considered while the unfavorable statements are excluded, his argument is not well-taken. Nevertheless, I shall consider whether Exhibits 2 and 3 ought not have been considered at the transfer hearing.[5]

---

[5]Since the petitioner's counsel did not object to the district court's consideration of the mental health evaluations at the transfer hearing, the petitioner's argument might be framed more appropriately as being based upon a claim that counsel provided constitutionally ineffective assistance. Indeed, the petitioner makes this argument in his brief. (See filing 29 at 27.) In order to demonstrate ineffective assistance, the petitioner must show that his counsel's performance was deficient and that the deficient performance

7

> In Miranda v. Arizona, 384 U.S. 436, 467 (1966), the Court acknowledged that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." Miranda held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id., at 444. Thus, absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has a "right to remain silent" and that "anything said can and will be used against the individual in court."

Estelle v. Smith, 451 U.S. 454, 466-67 (1981). In Smith, the Court held that "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination" that had been ordered to determine the defendant's competency to stand trial. Id. at 467. Since the defendant had not received Miranda warnings prior to the compulsory examination, the statements he made during that examination could not be used to establish his future dangerousness at his capital sentencing hearing. See id. at 468-69. However, the use of the compelled statements in a competency hearing would not have implicated the Fifth Amendment. See id. at 465.

In this case, the petitioner joined in the state's motion for the examination that formed the basis of Exhibit 3; indeed, he moved to expand the scope of the exam to encompass not just his competency to stand trial, but his eligibility for the insanity defense. Thus, although the examination associated with Exhibit 3 was "court-ordered" in a technical sense, I consider it to have been submitted to voluntarily for the purposes of the Fifth Amendment. "Volunteered statements . . . are not barred by the Fifth Amendment," and thus the district court's consideration of Exhibit 3 did not violate the privilege against self-incrimination. Estelle v. Smith, 451 U.S. 454, 469 (1981). See also Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987) (holding that a defendant would have no Fifth Amendment privilege against the introduction of psychiatric testimony that he requested).

On the other hand, Exhibit 2 resulted from court-ordered mental health examination

---

prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). It is axiomatic that the petitioner cannot show that he was prejudiced by counsel's failure to object to the consideration of the evaluations if that objection would have been overruled; therefore, I shall simply proceed to analyze whether the exhibits were properly considered at the transfer hearing, and I will revisit the question of whether counsel performed deficiently later, if necessary.

8

over the defendant's objection, and there is no indication that the petitioner received Miranda warnings prior to the examination. Nevertheless, the Nebraska Supreme Court determined that the Supreme Court's holding in Smith did not extend to the use of information obtained from compelled psychiatric examinations in a transfer hearing, and that the district court properly considered the exhibit. I must determine whether the Nebraska Supreme Court's refusal to expand the holding of Smith and apply it in this case was unreasonable. I find that it was not.

A juvenile court's decision to waive jurisdiction "is a 'critically important' action determining vitally important statutory rights of the juvenile." Kent v. United States, 383 U.S. 541, 556 (1966). Therefore, a transfer hearing "must measure up to the essentials of due process and fair treatment." Id. at 562. However, transfer hearings are not criminal trials. See id. ("We do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial . . . ."). In Estelle v. Smith, 451 U.S. 454, 465, 468 (1981), the Supreme Court held specifically that a defendant could be compelled to participate in a psychiatric competency examination, even if he invokes the privilege against self-incrimination, provided that the results of the examination are used only for the purpose of determining the defendant's competency. In those circumstances, the "neutral purpose" of the competency hearing would not be "frustrated," and the defendant's privilege against incriminating himself in the capital sentencing hearing would be protected. Id. at 465, 468. The facts here are analogous. As the Nebraska Supreme Court observed, the determination to be made at a transfer hearing does not concern the juvenile's "guilt or innocence" of the charged offense, but his "knowledge and amenability to treatment within the juvenile system." McCracken, 615 N.W.2d at 922. When compelled psychiatric examinations are used for this "neutral purpose," they do not offend the Fifth Amendment. See id.; see also United States v. A.R., 38 F.3d 699, 702-04 (3d Cir. 1994); United States v. Mitchell H., 182 F.3d 1034, 1035-36 (9th Cir. 1999); Davis v. State, No. 01-3400-DES, 2002 WL 113861 (D. Kan. Jan. 23, 2002).

I am mindful that the original "neutral" purpose of Exhibit 2 was to aid in the juvenile court's competency determination, and that it was ultimately considered to serve a different "neutral" purpose at the transfer hearing. I am also mindful of the "critically important" rights at stake in a transfer hearing. Kent, 383 U.S. at 556. However, I cannot conclude that the Nebraska Supreme Court unreasonably applied clearly established federal law when it declined to apply the Supreme Court's holding in Estelle v. Smith, 451 U.S. 454 (1981), in this case.[6] I therefore reject the petitioner's claims for habeas corpus relief

---

[6]I note parenthetically that in Penry v. Johnson, 532 U.S. 782 (2001), the United States Supreme Court counseled against expansive application of Smith, stating, "[O]ur opinion in Estelle suggested that our holding was limited to the 'distinct circumstances' presented there . . . . Indeed, we have never extended Estelle's Fifth Amendment holding beyond its particular facts." Penry, 532 U.S. at 795.

9

insofar as they depend upon the argument that the district court improperly considered the mental health evaluations at the transfer hearing.

### C. Whether the Use of the Mental Health Evaluations at Trial Violated the Petitioner's Rights

The petitioner argues that "he received ineffective assistance of legal counsel by counsel's failure to object to the use in his criminal trial of the mental health evaluations ordered by the juvenile court." (Filing 29 at 17.)

The Sixth Amendment guarantees that an accused shall have "the Assistance of Counsel for his defense." U.S. Const. amend. VI. "It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate . . . and it also follows that defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." Mickens v. Taylor, 535 U.S. 162, 166 (2002) (citing Strickland v. Washington, 466 U.S. 668, 685-86 (1984)). See also Bell v. Cone, 535 U.S. 685, 695 (2002):

> We reasoned that there would be a sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result if the defendant proved two things: first, that counsel's "representation fell below an objective standard of reasonableness," [Strickland,] 466 U.S., at 688 . . .; and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id., at 694. . . . Without proof of both deficient performance and prejudice to the defense, we concluded, it could not be said that the sentence or conviction "resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable," id., at 687. . ., and the sentence or conviction should stand.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, the court must examine "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690.

Strickland requires the court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Accordingly, a defendant must overcome the presumption that counsel's challenged action "might be considered sound trial strategy." Id.

To meet the prejudice prong of the test, the defendant must show a reasonable probability that absent his counsel's deficient conduct, the outcome of the defendant's trial would have been altered. "As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Mickens, 535 U.S. at 166 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Wiggins v. Smith, 539 U.S. 510, 534 (2003) (quoting Strickland, 466 U.S. at 694).

If counsel's performance was not deficient or if the petitioner suffered no prejudice, then the court need not address the other part of the test. See Williams v. Locke, 403 F.3d 1022, 1025 (8th Cir. 2005) ("we need not ask whether [the] lawyer's performance was deficient if we can clearly determine that no prejudice resulted from [the] lawyer's alleged error"). Accord Whitehead v. Dormire, 340 F.3d 532, 537 (8th Cir. 2003) ("a court deciding an ineffective assistance claim need not address both components of the inquiry if the defendant makes an insufficient showing on one"); Siers v. Weber, 259 F.3d 969, 974 (8th Cir. 2001) ("[w]e need not inquire into the effectiveness of counsel . . . if we determine that no prejudice resulted"), cert. denied, 534 U.S. 1138 (2002).

In this case, counsel objected to the admission of Exhibit 2, and the exhibit was not received into evidence at trial. Exhibit 3, however, was received without objection. Therefore, the petitioner's claim that counsel performed ineffectively is based solely on his failure to object to Exhibit 3 or testimony related to it.

The petitioner argues that Exhibit 3 should not have been received because he was compelled to participate in the psychiatric evaluation that was reported in Exhibit 3, and therefore the exhibit violated the privilege against self incrimination protected under the Fifth Amendment. However, the petitioner joined in the motion for this psychiatric examination, and it is well-established that the Fifth Amendment is not implicated when the prosecution introduces psychiatric testimony based upon a jointly-requested examination. See Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987) ("[I]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."). Thus, if trial counsel had objected to Exhibit 3 (or the testimony of Sweeney and Tatay insofar as it was based upon the jointly-requested psychiatric examination) citing a violation of the Fifth

11

Amendment privilege against self-incrimination, the objection would have been overruled. As a result, the petitioner cannot demonstrate that he was prejudiced by counsel's failure to object to that evidence.

I note that the Nebraska Supreme Court rejected the petitioner's argument on a different ground. See McCracken, 615 N.W.2d at 923-24. It appears that the court assumed that both examinations had been compelled, and that the Fifth Amendment privilege was therefore implicated when Exhibit 3 and "the testimony derived therefrom" were admitted into evidence at trial. Id. at 923. The court went on to conclude that the use of the "compelled" examinations at trial did not violate the Fifth Amendment privilege. Of course, the record clearly shows that Exhibit 2 was not received at trial, and Exhibit 3 was the result of a jointly-requested examination. It is therefore clear that the court's analysis is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, for the reasons stated above, the court's error does not avail the petitioner.[7]

### D. Whether the Court's Failure to Instruct the Jury on Lesser-included Offenses Deprived the Petitioner of Due Process and a Fair Trial

The petitioner alleges constitutional error in the trial court's failure to instruct the jury on the lesser-included offenses of second-degree murder and manslaughter. In McCracken, the Nebraska Supreme Court rejected that argument, holding that under state law and based on the evidence at trial, the petitioner was not entitled to the requested lesser-included offense instructions.

Nebraska uses the sequential "elements approach" set out in State v. Williams, 503 N.W.2d 561, 566 (1993), to determine when a lesser-included offense instruction is appropriate. In the first step, a court is to analyze the elements of both crimes at issue to determine whether the lesser offense is a lesser-included offense of the greater offense. If the lesser offense is found to be a lesser-included offense, a court thereafter goes on to the second part of the Williams test to determine whether an instruction on the lesser-included offense is justified based on the evidence at trial. State v. Wright, 622

---

[7] I see no need to discuss whether the Nebraska Supreme Court's analysis would be correct if it were not based upon "an unreasonable determination of the facts in light of the evidence" in the record. I note in passing, however, that the statements that Mr. Sweeney was allowed to relate at trial–without objection from counsel–included admissions that may not have been within the scope of the Fifth Amendment waiver that arises when a defendant raises the defense of insanity. See Buchanan v. Kentucky, 483 U.S. 402, 423-24 (1987). (See also BOE, Vol. III, at 466:16-12; but see BOE, Ex. 62, psychological assessment of James K. Cole, Ph.D., dated April 9, 1994, at 4, 7 (indicating that the petitioner's own expert concluded that the petitioner carefully planned the shooting).)

N.W.2d 676, 678, 680 (Neb. 2001). See also State v. McKimmey, 634 N.W.2d 817, 821 (Neb. App. 2001) (citing Williams, 503 N.W.2d at 566): "The elements test consists of two prongs, both of which must be satisfied before a court is required to give a lesser-included offense instruction: (1) [T]he elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense."

"[S]econd degree murder is clearly a lesser-included offense of first degree murder." McCracken, 615 N.W.2d at 917. "The primary difference between first and second degree murder is that second degree murder does not require a finding of deliberate and premeditated malice." Id. "Both murder in the first degree and murder in the second degree otherwise require the intentional killing of another human being." Id. at 917-18.

The Nebraska Supreme Court summarized the evidence as follows:

> In various statements after the shooting, which McCracken made to mental health professionals and police, McCracken explained that after he retrieved the gun from the upstairs bedroom, he went downstairs with the intent of shooting Bray, who was asleep on the sofa. McCracken's statements also show that he then became interested in a television show and sat down in a chair in the family room to watch television.
>
> Approximately 4 hours later when that television show was over, McCracken walked over to the couch where Bray was sleeping and put the gun to her head, firing his first shot. Bray sat up after being struck with the first shot, after which McCracken fired a second shot at Bray's head. This evidence was not controverted at trial. In addition to the foregoing undisputed evidence, shortly after he had shot Bray, McCracken admitted to police that he had planned to kill Bray around midnight, but did not actually do so until between 4 and 5 a.m.
>
> Thus, the record is replete with evidence that McCracken possessed the requisite premeditation to be convicted of first degree murder. A thorough review of the record, however, does not reveal any evidence from which a contrary inference could be drawn that would allow a jury to reasonably conclude that McCracken did not possess the requisite planning and deliberation for first degree murder.

Id. at 918.

While the petitioner's motive for killing his mother was to save her from emotional

13

suffering when he left home, his advance planning and deliberate choice to commit the act were not mitigated by his desire to save his mother pain. "[O]ne kills with 'premeditated malice' if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification." State v. Harms, 643 N.W.2d 359, 380 (Neb.), opinion modified on denial of reh'g, 650 N.W.2d 481 (2002). "'[D]eliberate' means not suddenly, not rashly, and requires that the defendant considered the probable consequences of his or her act before doing the act." Id., 643 N.W.2d at 380. The trial court's Instruction No. 7 adequately defined those terms consistently with state law.

Similarly, the homicide could not be considered to be a manslaughter. As the Nebraska Supreme Court noted:

> Manslaughter differs from murder in that the former requires no intent to kill, but involves the killing of another human being while in the commission of an unlawful act or upon a sudden quarrel . . . . In the instant case, there is no evidence, and McCracken does not argue, that Bray and McCracken were involved in a sudden quarrel just prior to the shooting; thus, the critical inquiry is whether there is evidence upon which the jury could have concluded that Bray's death was unintentionally caused while McCracken was committing an unlawful act.
>
> Cole testified, on McCracken's behalf, that McCracken knew what he was doing when he shot Bray and that McCracken knew it was wrong to do so. Cole's report, which was introduced at trial, states that McCracken "carefully planned the shooting, including a set of optional plans." Cole explained that McCracken followed through on this plan to kill Bray and thought it was the right thing for him to do because of the misery Bray would experience if he ran away. In other words, Cole's testimony and report unequivocally show that in Cole's opinion, McCracken intended to kill Bray, knew what he was doing when he shot her, and was well aware of the fact that his actions were wrong when he did so. Cole's testimony never challenged McCracken's ability to form the intent to kill; to the contrary, Cole's report and testimony reaffirmed that McCracken had formed such an intent. Thus, the undisputed evidence establishes that McCracken intended to kill Bray, and there simply was no evidence upon which the jury could have acquitted McCracken of first degree murder and convicted him of manslaughter.

McCracken, 615 N.W.2d at 918-19.

The petitioner argues that the record contained expert testimony that he suffered from mental illness. Although the jury did not agree with the defense of insanity, the

petitioner states that the jury should have been allowed to consider whether his mental illness precluded him from forming the specific premeditated intent necessary for first degree murder. However, a review of the record indicates that while the experts consistently expressed the view that the petitioner suffered from mental impairments, no mental health professional expressed the view that the petitioner lacked the mental capacity to plan and execute the murder. There is nothing in the medical evidence or the record on which a jury could have found that the petitioner lacked the specific intent to kill his mother or that he did not plan to do so in advance. He had formed the intent by midnight, obtained the weapon from a bedroom, got sidetracked by a television program, and then shot Vicky Bray twice. Perhaps the word "malice" confuses the issue. The petitioner does not claim that he believed he had "legal justification" to shoot his mother. That he did so to save her the pain of his departure from the family home constituted his motive but does not lessen his intent, purpose, planning or deliberation.

"To secure habeas relief, [a] petitioner must demonstrate that a state court's finding of [a factual issue] was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." Miller-El v. Cockrell, 537 U.S. 322, 348 (2003). The petitioner has not demonstrated that the state courts' factual determination of his state of mind was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). In light of the evidence of premeditation, deliberation and malice (in the legal sense) and the absence of evidence supporting the lesser offenses of second degree murder or manslaughter, the petitioner did not suffer constitutional error by the trial court's refusal to instruct on the lesser-included offenses.

### E. Remaining Ineffective Assistance of Counsel Claim

The petitioner argues that his counsel provided ineffective assistance in several respects. Specifically, he claims the counsel was ineffective because he 1) failed to persuade the court to instruct the jury regarding lesser-included offenses; 2) failed to object to the use of Exhibits 2 and 3 at the transfer hearing and on appeal; and 3) failed to file a plea in bar to preserve the issue of double jeopardy. The first two of these arguments fail because, for the reasons stated above, the petitioner has not shown that the result of the proceedings would have been different if counsel had argued more strenuously for the lesser-included offense instructions or objected to the use of the mental health evidence. The petitioner's third claim remains to be analyzed.

The petitioner alleges that his trial attorney should have filed a plea in bar to preserve the issue of double jeopardy when the County Attorney dismissed the juvenile petition and filed an information in district court. However, as the Nebraska Supreme Court noted, jeopardy never attached in the juvenile court proceedings because the court never proceeded beyond the stage of ordering evaluations, and never heard evidence or

adjudicated any facts.  McCracken, 615 N.W.2d at 924-25.  Because any plea in bar would have been overruled, id., the petitioner suffered no prejudice from his attorney's failure to invoke the procedure.

      THEREFORE, IT IS ORDERED:

      1.    That the Petition for Writ of Habeas Corpus filed by the petitioner, Darren McCracken, is denied and dismissed with prejudice; and

      2.    That a separate judgment will be entered accordingly.

      DATED this 28th day of September, 2005.

                                BY THE COURT:

                                s/ Warren K. Urbom
                                United States Senior District Judge